## UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| IN THE EX PARTE MATTER OF:<br><br><br>THOMAS PRINS, | Case No. |

### DECLARATION OF EDDIE WANG, M.D.

I, Eddie Wang, make the following statements under oath and subject to the penalty of perjury pursuant to the provision of 28 U.S.C. § 1746.

1. I am a licensed, Board-Certified Family Medicine physician assigned to the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), ICE Health Service Corps (IHSC) as the Clinic Director (CD) at the Northwest ICE Processing Center (NWIPC) in Tacoma, Washington. I have held this position since October 10, 2021.

2. ICE is committed to ensuring that every person detained in its custody receives timely access to necessary and appropriate medical, dental, and mental health care and treatment while in custody. The health, safety, and welfare of those detained in its custody are among agency's highest priorities, and IHSC has protocols in place to ensure that any patient on a hunger strike within its detention facilities is promptly and appropriately addressed and treated.

3.      As the Clinic Director at the NWIPC, my duties include providing medical care for noncitizens, supervising and consulting with advanced practice providers, and advising and supporting the health service administrator.

4.      This declaration is made in support of the Motion by the United States of America to perform involuntary vital measurements, and involuntary laboratory for Thomas Prins, Axxx-xxx-xxx (hereinafter Prins), who is detained at the NWIPC.

5.      I am one of the treating providers for noncitizen Prins, and I make this declaration upon a review of his medical record and extensive consultation with treatment providers.

6.      Noncitizen Prins is a native and citizen of Canada.  He entered the NWIPC on November 19, 2023.

7.      Prins is on hunger strike and is preventing necessary medical monitoring and intervention. He risks permanent organ damage and death.  On March 29, 2024, Prins missed his ninth consecutive meal and was classified as a hunger striker pursuant to IHSC guidance.  Prins states that the purpose of the hunger strike is to have the label of ███████████ stricken from his record, to be allowed to air his grievances to multiple authorities including the Clinical Director, facility administrators, FBI and others.  As of breakfast on April 26, 2024, he has missed 92 meals.  Prins has consumed no food since he initiated his hunger strike.  Prins drinks water, but there are periods where he does not and his hydration is inadequate. He has refused offers of the nutritional supplement Boost or other efforts while at the detention center to manage his dehydration.

8.      Prins has been evaluated by a ███████████.  Since his arrival to NWIPC, he has ███████████████████████████████████.  Prins has a diagnosed ███████████. However, his ███████████████████ does not show evidence that would cause him to not

eat or drink. Despite ██████████████████████, he appears to be operating under his own free will.

9.      Prins has been counseled by medical staff on the effects of self-imposed dehydration and starvation on his body. He has also been informed of the involuntary hydration and feeding procedures that will be pursued to prevent injury and/or death to himself should he continue not to eat.

10.     On April 15, 2024, Prins reported ████████████████████████████████, ████████████████████████████████████████████████████████████. ████████████████████████████████████████████████████████████████ ████████

11.     He remains in custody at the NWIPC and under medical observation by IHSC's team of nurses and medical service providers.

12.     Prins ████arly refuses to allow the medical staff to perform vital signs and basic physical examinations with minor exceptions. He consented and gave limited blood and urine ██████ on April 8, 2024. Those results were ██████████████████████████████ ████ He has refused further or additional laboratory testing. On April 18, 2024, he allowed his weight and vitals to be taken, which were ████████████████. Medical providers have requested that Prins allow for medical assessments daily since March 29, 2024. On April 19, 2024, Prins allowed for his vitals to be taken, which were ████████████████. On April 20, 2024, Prins allowed for more extensive evaluations that included vital signs and orthostatic blood pressure readings. This is where a patient's blood pressure is initially obtained at a sitting position, then asked to stand for one minute and then have vital signs obtained. On April 20, 2024, Prins' ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████ Since April 20, 2024,

Prins has declined to have his vital signs taken nor allowed for medical examination.

14. It is of interest that Prins' initial intake weight was ███ lbs on November 19, 2023.

Prins has multiple hunger strikes at NWIPC. ████████████████████████████

███████████████████████████████████████████ On December 29,

2023, Prins weighed ███ lbs. By February 20, 2024, he weighed ███ lbs. In the intervening

period, he requested to have two sack meals in addition to his usual three meals for four to five

weeks before he initiated this current hunger strike. IHSC does not know Prins' weight when he

started the current hunger strike because he did not allow IHSC staff to weigh him. However, his

most recent weight on April 21, 2024, was ███ lbs.

15. Laboratory tests are needed to evaluate the metabolic state to include electrolytes and

kidney function.

16. The laboratory tests that need to be obtain during a hunger strike include:

    a.    Complete metabolic panel. This test reveals an increase in markers of kidney function in view of any renal injury. The panel tests BUN (blood urea nitrogen) creatinine level and proteins. It also reveals electrolyte disturbances that can lead to heart arrhythmias such as potassium, phosphate, magnesium and glucose levels.

    b.    Complete blood count. This test reveals the hemoglobin level.

    c.    Urinalysis, which reveals the presence of ketones, blood and crystals in the urine, as well as specific gravity.

    d.    Thiamine levels to assess deficiency at day 14 of a hunger strike.

    e.    Electrocardiogram, if the patient shows elevated potassium, which can lead to arrhythmias.

    f.    Creatinine phosphokinase (CPK), which is an enzyme found inside muscle cells and is released into the blood when the muscle cells rupture. The increase in CPK can lead to rhabdomyolysis, a breakdown of muscle

tissue that can fatally damage other vital organs.

g.    Prealbumin, used as a marker for nutritional status evaluation. Prealbumin will decrease over time the longer a patient fails to consume adequate nutrition, and the prealbumin level correlates with patient morbidity and mortality risk. Normal prealbumin is 15-35 mg/dL. When prealbumin falls to 5-11mg/dL, significant morbidity risks exist, and aggressive nutritional support is necessary.

17.    It is difficult to predict how long the human body can survive without food; if an individual does not have adequate fat stores, this time decreases significantly. If an individual goes without water for approximately eight to ten days, he will suffer from dementia and delirium seizures and ultimately become unconscious. Dehydration greatly accelerates a progressive starvation because the waste that the body produces is not excreted. Death by terminal total fasting occurs by acute depletion of thiamine, causing fatal arrhythmia and/or cardiac arrest.

18.    Prins's condition is expected to decline as his hunger strike continues.

19.    Medical literature reflects that metabolic imbalance, caused by fasting, is likely to result in permanent bodily damage and/or death once weight loss reaches 18% of the patient's initial weight.

20.    The medical staff has █████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████.

21.    Medical providers have personally explained to Prins, which they have shared with me, the concerns regarding his condition and the medical risks involved with a continuing lack of nourishment. That is, he risks significant and ongoing metabolic changes induced by his decreased nutritional intake. If he continues his hunger strike, he will reach a state of severe metabolic

imbalance, with a high risk of adverse consequences such as permanent damage to his kidneys, liver, heart failure and the risk of death. Prins stated to the providers that he would continue his hunger strike.

22.    In my professional medical judgment, if Prins continues his hunger strike, with the aggravating factor of inappropriate oral hydration, he will reach the point where he will require immediate medical intervention to prevent further deterioration and serious medical complications. Continued fasting will result in permanent damage to his internal organs and has the potential to become life threatening. Metabolic imbalance, if left untreated, will cause fatal arrhythmia and/or cardiac arrest.

23.    It is necessary to perform laboratory tests and physical evaluation to monitor and assess Prins's clinical condition. If his laboratory tests reveal other conditions requiring medical attention, it may be necessary to administer such medications intravenously.

24.    Based on Prins's current physical condition, and the fact that he has not had adequate nutritional intake since March 29, 2024, nor had appropriate oral fluid intake, it is my medical opinion to a reasonable degree of medical certainty that involuntary medical assessments and physical assessments, including vital sign monitoring and laboratory monitoring are required at this time. His lack of nutritional intake compounded by his voluntary dehydration can drastically exacerbate the effects of his hunger strike.

25.    The issuance of a court order to perform involuntary blood draws, collecting urine samples, and all necessary physical examinations is medically necessary to preserve and sustain Prins's health, welfare, medical safety, and life.

26.    To ensure the patient's health, welfare, medical safety, preservation of life. Should the patient refuse to cooperate with medical assessments, laboratory blood draws, or other samples

for testing, medical soft restraints will be required to immobilize the patient and prevent unnecessary injury to both the patient and medical staff.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 26, 2024.

Eddie Wang, M.D.
Clinic Director
NWIPC